# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES, *ex rel.* THOMAS WATKINS, | ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| v. | ) ) | Case No. 4:10-cv-4010 |
| KBR, INC., and KELLOGG BROWN & ROOT SERVICES, INC., | ) ) ) | |
| Defendants. | ) ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Defendants' Motion to Dismiss Complaint (Doc. 37). The Complaint (Doc. 1) consists of a single count alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et. seq.* (the "FCA"). Defendants assert that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because the Relator has failed to plead viable theories of actionable fraud under the FCA. Defendants also assert that the Complaint's allegations have not been pled with sufficient particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion (Doc. 37) is GRANTED.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934–35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (internal quotation marks omitted). "The complaint must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)) (internal quotation marks omitted). "[A] plaintiff's claim need not be probable, only plausible." *Id.* "To meet this plausibility standard, the complaint must supply enough fact[s] to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556) (internal quotation marks omitted)).

Rule 9(b) imposes a higher pleading standard than that required under Rule 8. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). "The [False Claims Act] is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)."

*United States ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *Hofer*, 649 F.3d at 615 (citation omitted).

## FACTUAL BACKGROUND[1]

Relator, Thomas Watkins, joined defendant Kellogg Brown and Root Services Inc. ("KBRSI") in September 2004. In May 2005, he was assigned to the company's Baghdad, Iraq facilities as a Senior Manager, Accounting & Finance, Middle East/Central Asia, and became responsible for accounting functions under the LOGCAP III contract. Relator developed most of the procedures for accounting operations under the LOGCAP III contract. Relator resigned in March 2008. Prior to joining KBRSI, Relator had extensive accounting, finance, business, and management experience.

KBRSI is a wholly owned subsidiary of defendant KBR Inc. ("KBR"). KBR is a Delaware corporation with its principal place of business in Houston, Texas. KBR holds the LOGCAP III contract and has assigned responsibilities for that contract to KBRSI. KBRSI is also a Delaware corporation with its principal place of business in Houston, Texas.

---

[1] As noted above, all well-pled facts must be construed in the plaintiff's favor when ruling on a Motion to Dismiss, so these background facts are drawn from the Complaint. (Doc. 1).

The Logistics Civil Augmentation Program ("LOGCAP") was established in 1985 to facilitate civilian contractor logistical support for United States military forces deployed overseas, principally in countries with which the United States does not have treaties or agreements that would enable the host country to provide such support. Under the LOGCAP, a single company was awarded a contract to provide a wide range of logistical services. Each LOGCAP prime contract contains a Statement of Work describing generally the types of services to be provided by the LOGCAP contractor. The services provided under the LOGCAP include supply operations (such as the delivery of food, water, fuel, spare parts, and other items), field operations, such as dining and laundry facilities, housing, sanitation, waste management, postal services, and morale, welfare and recreation facilities, engineering and construction services, support to communication networks, transportation and cargo services, and facilities maintenance and repair.

LOGCAP contracts are awarded periodically. After a no-bid process, the United States awarded the third such contract, LOGCAP III, to Brown and Root Services, a division of KBR, in December 2001. Thereafter, KBR transferred the responsibilities for the LOGCAP III contract to KBRSI.

The LOGCAP III contract was awarded by the United States Army Field Support Command ("AFSC"), headquartered at Rock Island, Illinois. AFSC administered the LOGCAP III contract until September 2006, when United States Army Sustainment Command ("ASC") was created to succeed AFSC as the logistics integrator for contingency contracting. ASC, also headquartered in Rock Island, Illinois, succeeded ASFC as the administrator of the LOGCAP III contract.

The LOGCAP III contract had a one-year base period and nine one year renewal options. The United States recently awarded the LOGCAP IV contract to three contractors and has begun transitioning LOGCAP operations to LOGCAP IV. LOGCAP operations in Iraq, however, continue (as of the date of the filing of the Complaint) to be performed pursuant to the LOGCAP III contract.

The Government and the contractor execute task orders detailing particular operations or services that the contractor must furnish under each LOGCAP contract. Task Orders 59, 89, and 139 are the largest task orders under LOGCAP III. They require the contractor to satisfy a wide variety of the military's logistical needs in Iraq, including camp maintenance, construction, meals, and other services for as many as 130,000 troops at dozens of camps. Army officials in Rock Island, Illinois issued Task Order 59 to KBR in August 2003, issued Task Order 89 to KBR in May 2005, and issued Task Order 139 to KBR in August 2006.

Defendants staffed Task Orders 59 and 89, and staff Task Order 139, principally with United States citizen workers, but KBR also employed and continues to employ a sizable number of European citizens to perform work under Task Orders 59, 89, and 139. KBR transports those workers to Baghdad, Iraq, and houses them there.

Pursuant to the terms of its agreement with the Government, KBR pays to return its employees and subcontractors' employees to their point of origin—usually their home or point of hire—for periodic vacations or at the termination of their employment. If employees wish to go somewhere other than their point of origin,

KBR will pay up to the cost of transporting them to their point of origin, and the employees are responsible for paying any excess travel cost.

LOGCAP III is a cost reimbursement, award-fee contract. Pursuant to the contract, the Government pays KBR the cost of performing the contract. KBR's recoverable cost includes both the cost of performance and an additional percentage of those costs to cover expenses. The Government also pays a fixed "award fee" of one percent of the cost of performance, and up to an additional two percent of the cost as a performance incentive. Thus, in cost-reimbursement contracts such as LOGCAP III, contractors' fees rise with contract costs such that increased costs translate into increased fees to the contractor. The LOGCAP III contract and the task orders executed under it are governed by the Federal Acquisition Regulation ("FAR"), codified in Chapter 48 of the Code of Federal Regulations.

Task Orders 59, 89 and 139 provide that one allowable cost of the contract is the cost of rotating contractor employees into and out of the theater for periodic vacations and at the termination of employment. KBR refers to this as "repatriation and rotational leave." KBR has employed tens of thousands of people at a time in the theater of operations pursuant to Task Orders 59, 89, and 139. KBR is responsible for transporting those people to and from Iraq, both at the beginning and end of their employment and for periodic vacations during their employment. KBR transports hundreds of people into and out of Baghdad each day for repatriation and rotational leave.

Since 2004, KBR has arranged for charter flight service into and out of Baghdad for repatriation and rotational leave. KBR's chartered flights transport its

personnel to and from hub airports in other countries, where KBR personnel can transfer to commercial flights to their point of origin or other destinations.

Prior to 2004, the Government did not allow private charters to fly into the Baghdad airport. KBR persuaded the Government to do so after providing detailed cost and pricing information demonstrating that private chartered air service would be less costly than ground convoys or the use of available space on military flights.

Pursuant to its repatriation and rotational needs under Task Orders 59, 89, and 139, KBR has chartered regular flights to and from Baghdad through hub airports in Dubai, United Arab Emirates and Kuwait, and has arranged or paid for further travel from those hubs. The vast majority of KBR personnel travel through Dubai for their repatriation and rotational leave.

Because of the limited number of flights into and out of Dubai and restrictions on the timing of charter flights out of Baghdad, KBR personnel traveling to or from Baghdad through Dubai generally have long layovers ranging from several hours to a full night. KBR arranges for lodging, meals for its employees and subcontractor employees during such layovers, and certain administrative processing necessitated by the layover in Dubai. The cost of food, lodging, and the travel operations staff needed to process KBR travelers in Dubai for over 40,000 travelers per year is substantial. For example, in one twelve month period from mid-2005 to mid-2006, the cost to KBR of the Dubai layover was $84,650,000. Relator understands that KBR has incurred Dubai layover costs of similar magnitude throughout the duration of Task Orders 59, 89, and 139.

KBR has submitted invoices or vouchers to the United States seeking reimbursement of its claimed allowable repatriation and rotational leave costs under Task Orders 59, 89, and 139, including the cost of the Dubai layovers. The United States paid each such invoice or voucher claiming the costs of the Dubai layover, plus additional general and administrative costs, the one percent mandatory award fee applied to costs, and a portion of the remaining two percent discretionary award fee applied to costs.

In 2006, KBR solicited bids from vendors for charter flight service from Baghdad for repatriation and rotational leave beginning in January 2007, after the expiry of the prior charter aviation subcontract. KBR asked the vendors to bid on the existing Iraq-Dubai/Iraq-Kuwait schedule (the "Dubai Plan"), as well as an alternative Iraq-Frankfurt/Iraq-Dubai/Iraq-Kuwait schedule (the "Frankfurt Plan"). The Frankfurt Plan would continue to include flights to Dubai, albeit a reduced number of such flights.

According to the Relator, the addition of the Frankfurt route would allow KBR to transport most of its personnel to a hub airport with a wider and less-expensive range of options. Most KBR personnel traveling through Frankfurt would not require lodging, substantial meal expenses, or certain administrative processing before transferring to connecting flights. Thus, a Frankfurt transfer point would dramatically reduce the cost of KBR's repatriation and rotational leave travel costs. In addition, because transportation between Frankfurt and the United States or Europe is substantially less expensive than transportation between Dubai and those locations, a Frankfurt hub would result in additional substantial cost savings.

Four vendors submitted bids on the two proposed schedules. Two bids were disqualified. KBR deemed the remaining two bids, from Skylink Arabia (the incumbent charter carrier) and Ecolog AG, to be technically acceptable and in the competitive range. Skylink Arabia bid $45,699,066 per year to provide charter service pursuant to the Dubai Plan, or $68,026,140 per year pursuant to the Frankfurt Plan. Ecolog AG bid $35,893,566 per year to provide charter service pursuant to the Dubai plan, or $58,683,025 per year pursuant to the Frankfurt Plan.

While the cost of the charter service alone was more expensive under the Frankfurt Plan than under the Dubai Plan, Relator asserts that difference was far smaller than the savings that KBR would have realized under the Frankfurt Plan by eliminating most Dubai layover costs and enabling less expensive connecting flights. According to KBR's own June 2006 internal analysis, KBR expected to save approximately $75,000,000 realized over the term of a year by implementing the Frankfort Plan. Relator received a copy of that internal analysis in the ordinary course of his duties.

In June 2006, KBR convened a meeting to discuss the bids. Approximately fifteen KBR employees attended the meeting including: Jim Stapleton, Chief of Staff to Steve Arnold, KBR's Vice President and Program Manager for LOGCAP III; Mike Mayo, KBR's Deputy Program Manager for LOGCAP III Support; Neal Jackson, the Aviation Manager responsible for repatriation and rotational leave travel; Kelly Beaver, the Project Manager for KBR's Dubai Operations Center; Gary Steinke, the Subcontract Administrator who sent the June 2006 internal analysis to

Relator; and Relator. KBR made copies of the June 2006 internal analysis available at the meeting.

During the meeting, Jackson, the person directly responsible for managing the cost of travel associated with repatriation and rotational leave, strongly advocated adoption of the Frankfurt Plan, with concurrence from some other participants. Beaver strenuously opposed the Frankfurt Plan. As head of KBR's Dubai Operations Center, Beaver had a vested interest in maintaining the status quo because his unit's responsibilities would be eliminated, or at least substantially diminished, under the Frankfurt Plan. At the close of the meeting, Mayo informed the participants that they would not proceed with the meeting and he instructed the participants to leave all materials distributed at the meeting on the table for collection, including the June 2006 analysis concluding that the Frankfurt Plan would save $75 million annually. Despite the savings that KBR expected to realize, KBR rejected the Frankfurt Plan. Instead, it retained the Dubai Plan, pursuant to which it continues to operate charter flights.

KBR submitted certain cost and pricing data to the Government in connection with the definitization of Task Orders 59, 89, and 139. "*Definitization* means the agreement on, or determination of, contract terms, specifications, and price, which converts the undefinitized contract action to a definitive contract." 48 C.F.R. § 217.7401(b). KBR also certified, as of the date of definitization of each of those task orders, that the cost or pricing data submitted to the Government were accurate, complete, and current as of the date of

definitization. Task Order 59 was definitized in March 2005.[2]

However, according to the Relator, the cost and pricing data KBR submitted were not "accurate, complete, and current" because KBR did not provide the Government with the June 2006 bid analysis that concluded the Frankfurt Plan would result in a substantial cost savings of approximately $75,000,000 realized over the term of a year, or the bid materials supporting that conclusion. Relator contends that KBR's failure to provide the Government with "accurate, complete, and current" information concerning the Frankfurt Plan was unlawful under the Truth In Negotiations Act ("TINA"), and rendered false each of KBR's Certificates of Current Cost or Pricing Data submitted after June 2006.

Moreover, Relator contends the costs associated with the layovers necessitated by the Dubai Plan are not "allowable costs" under applicable government regulations. Each voucher or invoice that KBR submitted to the United States claiming costs associated with the Dubai layovers necessitated by the Dubai Plan was, pursuant to the terms of the LOGCAP III contract and Task Orders 59, 89, and 139, and the FAR provisions referenced therein, an affirmative statement that such costs were "allowable" and "reasonable," and thus each such statement therefore was a false claim for payment.

In sum, Relator alleges that the Defendants violated the FCA in two ways. First, Defendants falsely certified the accuracy, completeness, and currency of the cost and pricing information that they provided to the Government by withholding

---

[2] There are no allegations in the Complaint as to the specific dates of the definitization of Task Orders 89 and 139 or the actual dates the alleged certifications were made.

information about their decision to reject the projected $75 million in annual cost savings in the June 2006 internal analysis.

Second, Defendants submitted invoices or vouchers to the Government claiming reimbursement for costs that they knew were not reasonable or allowable under the applicable law because the Defendants had rejected bids from vendors for the provision of travel services that would have resulted in a substantial cost savings of approximately $75,000,000 annually.

## DISCUSSION

This is a single count FCA action premised upon the violation of a contract that incorporated certain federal laws and regulations within its terms. Unlike prototypical FCA claims, where the actual claims for payment themselves are alleged to be false, this case involves a less straightforward path between what is alleged to be false and the payment of the claims. *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) ("A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment."). While the theories of liability presented by the Relator may have some merit, at the end of the day, the Relator's allegations are not enough to connect the alleged violation of TINA and FAR regulations to the allegedly false statement made by Defendants to get a submitted claim paid; and the Complaint lacks crucial factual allegations that would make the offered theories of liability plausible.

**I.**     **The Relator's TINA Certification Theory Of Liability Fails To State A Viable False Claims Act Theory And Also Lacks Sufficient Facts Under Rule 9(B) Of The Federal Rules Of Civil Procedure.**

Relator alleges that the Defendants have violated 31 U.S.C. § 3729(a)(1) subparagraphs (A), (B), (C) and (G), which provides for civil penalties and treble damages for those who are liable for the following acts:

> (A) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspiring to commit a violation of subparagraph (A), (B), . . . or (G);
> or
> (G) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

The Truth in Negotiations Act, 10 U.S.C. § 2306a ("TINA") requires a government contractor to certify that to the best of the contractor's knowledge and belief, cost and pricing data submitted to the Government is accurate, complete, and current as of the date the contract's terms are settled. 10 U.S.C. § 2306a(a)(2). Relator alleges that this certification is a condition of payment but does not cite any authority for that proposition. He further alleges that Defendants were obligated to make the Government aware that there was a projected $75 million in annual cost savings in a June 2006 internal bid analysis under TINA and various subparts and sections of the Federal Acquisitions Regulation ("FAR"), such as 48 C.F.R. § 15.403-4. Defendants first argue that the $75 million figure upon which Relator's claims are based was merely an estimate and therefore does not qualify as "cost or pricing data" subject to certification under TINA. Relator responds that this argument calls

for a factual determination and is inappropriate for resolution pursuant to a Rule 12(b)(6) motion. Relator also contends that his allegations—that Defendants did not inform the Government that the Defendants solicited bids, received four vendor quotations, carefully analyzed two quotations, and recommended accepting one— suffice to state a claim under the FCA.

Before discussing "cost and pricing data" and what that term covers, the Court believes it is more useful to begin with Defendants' other argument that the TINA certifications themselves cannot give rise to liability under the FCA. Defendants rely on *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) for the proposition that to be held liable under the FCA based on a regulatory violation, a contractor *in making its claim for payment* must certify its regulatory compliance, despite knowing the certification to be false.

### A. The Relator has not successfully pled that Defendants falsely certified regulatory compliance in order to receive money from the Government.

In *Yannacopoulos*, the court recognized that "[t]o establish civil liability under the False Claims Act, a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id.* at 822. There, a relator alleged that the defendant falsely certified compliance with certain contractual requirements with a government defense agency in order to secure payment of invoices submitted to the agency. *Id.* at 821-22. The defendant was required to certify compliance with the contract by submitting a certification agreement. *Id.* However, the defendant was also required to certify on each and

every invoice it submitted that the invoice itself was made in accordance with the contract and the certification agreement. *Id.* at 824. According to Defendants, it was the certifications on the invoices that were the sources of potential FCA liability in *Yannacopoulos*, not the certifications made in relation to general compliance with the contract. Defendants' proposition is reasonable because the *Yannacopoulos* court wrote: "These [invoice] certifications are significant because a mere breach of contract does not give rise to liability under the False Claims Act." *Id.* As an ancillary claim, relator also alleged that defendant had violated the Arms Export Control Act, but the court rejected that theory outright because there was no evidence that the defendant ever certified compliance with that Act. *Id.* at 824, n.4.

If *Yannacopoulos* can fairly be read to say that the allegedly false general certifications the defendant made that it was in compliance with the contract were not material to the government agency's decision to pay the claims; whereas the specific certifications appearing on the face of each and every invoice were material to the decision, then *Yannacopoulos* surely defeats Relator's claim. This Court is of the opinion that the certifications present on each and every invoice constituted the "false statements" in *Yannacopoulos*. In this case, there are no allegations in this Complaint that the invoices or vouchers submitted to the Government carried with them any certification requirements similar to those in *Yannacopoulos*.

Relator responds that the submission of a TINA certificate is essential to the definitization of each Task Order under 10 U.S.C. § 2306a(a)(1)(A), thus he has satisfied his burden of pleading a certification that was material to the Government's decision to pay. Realtor's reliance on the text of the statute is

misplaced. First, the statute provides in relevant part that an "offeror for a prime contract… shall be required to submit cost or pricing data <u>before the award</u> of a contract." 10 U.S.C. § 2306a(a)(1)(A) (emphasis added). The LOGCAP III was already awarded to Defendants in 2001, several years before the alleged cost and pricing data at issue here even existed. Second, definitization is a separate and independent phenomenon than the payment of invoices, as the Relator's own allegations imply. (*See* Doc. 1 at ¶ 31 (implying that payments under LOGCAP III occur independently and without regard to the definitization of any individual task order)). Indeed, one of the regulations Relator cites to as a source of the requirements is entitled "Payment of Allowable Costs Before Definitization" and no, it does not require a statement of allowable costs or a certification of reasonableness to be submitted along with invoices for payment. 48 C.F.R. § 52.216-26.

Relator also cites *Veridyne Corp. v. United States*, 758 F.3d 1371 (Fed. Cir. 2014) for the proposition that where a contract was procured by fraud, the invoices for payments themselves do not need to contain false statements to form the basis of FCA liability. *Veridyne* (as well as *United States ex rel. Marcus v. Hess*, 317 U.S. 537, upon which *Veridyne* relies) is easily distinguishable from this case because there is no allegation here that the LOGCAP III or any of its Task Orders were procured by fraud such that invoices for payment under them are tainted. Similarly, Relator's reliance on *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 920 (4th Cir. 2003) is also misplaced.

Relator cites that case in support of his argument that once an initial false certification is made all following invoices are tainted by fraud. But that was not

*Harrison*'s ruling. The *Harrison* court held the evidence adduced at trial demonstrated that at all times relevant the defendant possessed the requisite intent to defraud the government and such intent was not negated by the Government's payment of invoices after the Government attained knowledge of the underlying fraud. *Id.* at 920 ("This evidence demonstrates that <u>when</u> Westinghouse submitted its <u>initial</u> PUR package and <u>all of the twenty-five subsequent invoices</u>, it intended for DOE to believe (which it did) that no OCI existed."). In any event, the *Harrison* court viewed the defendant as having fraudulently obtained the contract and thus as having fraudulently obtained payment for each claim under the contract. *Id.* at 920 n.13. The Court has already rejected the assertion that LOGCAP III or any of the Task Orders where fraudulently obtained.

For the reasons stated above, the Court rejects Relator's theory of liability based upon the TINA certifications because the Relator has not alleged facts that satisfy the first prong of his pleading requirement. To "establish civil liability under the False Claims Act, a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." 652 F.3d at 822. The Court concludes that under existing Seventh Circuit precedent, certifying that the cost and pricing data was accurate, complete and current was too remotely connected to the obtainment of payment under the LOGCAP III to incur liability under the FCA.

**B.    Cost and Pricing Data**

"Cost and pricing data" is defined in TINA as:

all facts that, as of the date of agreement on the price of a contract . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly. Such term does not include information that is judgmental, but does include the factual information from which a judgment was derived.

10 U.S.C. § 2306a(h)(1). FAR 2.101 further clarifies that

Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred. They also include, but are not limited to, such factors as—

(1) Vendor quotations;

(2) Nonrecurring costs;

(3) Information on changes in production methods and in production or purchasing volume;

(4) Data supporting projections of business prospects and objectives and related operations costs;

(5) Unit-cost trends such as those associated with labor efficiency;

(6) Make-or-buy decisions;

(7) Estimated resources to attain business goals; and

(8) Information on management decisions that could have a significant bearing on costs.

48 C.F.R. § 2.101.

Relator's first proposition—that it is premature to decide whether the 2006 bid analysis is cost and pricing data—is unavailing. Defendants contend that the Complaint does not contain sufficient factual matter, accepted as true, to state an FCA claim to relief that is plausible on its face. Such an inquiry into the sufficiency

of a complaint is proper on a Rule 12(b)(6) motion. *See e.g.*, *Indep. Trust Corp.*, 665 F.3d at 934–35.

In the Complaint, Relator alleged the Defendants "withheld information about their decision to reject $75 million." (Doc. 1 at ¶6). Elsewhere he alleges KBR submitted certain cost and pricing data to the Government in connection with the definitization of Task Orders 59, 89, and 139, (Doc. 1 at ¶58), but withheld an internal June 2006 bid analysis concluding that the Frankfurt Plan was expected to result in "a substantial cost savings of approximately $75,000,000 realized over the term of a year" and "the bid materials" supporting that conclusion. (Doc. 1 at ¶59). The Court takes the Relator's term "bid materials" to refer to the data forming the basis for the estimate. The Complaint also contains a section summarizing the applicable laws and regulations. (Doc. 1 at 7-12).

It is apparent from the face of the Complaint, as well as the bid analysis attached to the Complaint as an exhibit, that the $75 million savings was an expectation and potential outcome. An expectation is a belief that something will occur in the future. The Complaint and bid analysis do not contain information on how the $75 million estimate was calculated, nor do they identify or describe any of the underlying data and calculations used to arrive at the estimate.[3]

It is the underlying data and calculations that qualify as "cost and pricing data" as that term is defined under the law, not merely the end product estimate itself or the third-party bids for that matter. 48 C.F.R. § 2.101 ("Cost or pricing

---

[3] This is particularly alarming considering Relator's allegations that he was a Senior Manager, Accounting & Finance, Middle East/Central Asia, responsible for accounting functions under the LOGCAP III contract and had developed most of the procedures for accounting operations under the LOGCAP III contract.

data. . . are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs…."); 10 U.S.C. § 2306a(h)(1) ("Such term does not include information that is judgmental, but does include the factual information from which a judgment was derived."). While it is reasonable to assume that some employees of the Defendants possess (or possessed) the data and calculations utilized to compute the $75 million expectation, the Complaint does not identify who those employees are. Moreover, the Complaint plainly alleges that the charter flight services themselves under the Frankfurt Plan were more expensive than the Dubai Plan. This fact alone highlights the structural problem facing Relator in pleading a plausible claim under the FCA. Generally speaking, to establish civil liability under the FCA, a plaintiff must allege and prove that the defendant in some fashion made a false statement in order to receive money from the Government. *See Gross*, 415 F.3d at 604. There are no allegations in the Complaint that there is anything false about the charter service bids or the failure of Defendants to disclose the bids to the Government. Rather, Relator's theory is based upon Defendants' failure to disclose to the Government its June 2006 conclusory analysis that the Frankfort plan would result in an estimated $75 million savings in repatriation and rotational costs during a one year period that substantially outweighed the increased cost of the charter flight service.

Relator responds that Defendants ignore that his claim encompasses the "other information" Relator has alleged Defendants failed to turn over to the Government, including the fact that the Defendants solicited bids, received four vendor quotations, carefully analyzed two quotations, and recommended accepting

one. Thus, he is contending that all cost and pricing information associated with those repatriation and rotational costs and the showing of a reduction in those costs under the Frankfurt Plan was information that should have been given to the Government prior to negotiating a Task Order after June 6, 2006. There are two problems though: First, more is needed than just a <u>conclusory</u> estimate of saving $75 million under the Frankfurt Plan; there also must be facts and figures supporting that conclusion and that would allow the Government to perform a meaningful audit. Otherwise, the whole estimate falls outside the definition of cost and pricing information. Second, the Complaint should have contained facts to show that the cost of repatriation/relocation services under the retained Dubai Plan are unreasonable in light of the cost information withheld from the government.

Relator cites to 48 C.F.R. § 2.101 for the proposition that vendor quotations are included within the items that qualify as cost and pricing data. He also cites to *In Re Aerojet Solid Propulsion Co.*, ASBCA No. 44568, 00-1 BCA (CCH) ¶30,855 (Mar. 17, 2000), for the proposition that bids themselves are cost or pricing data within the meaning of TINA.

First, the Court does not interpret 48 C.F.R. § 2.101 to instruct that all vendor quotations are *per se* cost and pricing data. Instead, the Court interprets the inclusion of vender quotations into the list of factors at 48 C.F.R. § 2.101 as an example of items that <u>can</u> qualify as cost and pricing data <u>if</u> the preliminary conditions of being factual, verifiable and not judgmental are satisfied. Relator has not cited any authority to make this Court conclude its interpretation of the regulation is incorrect.

Second, as alluded to earlier, even if the Skylink Arabia's and Ecolog AG's bids were disclosed to the Government, there is no information provided in the Complaint as to how these bids would have influenced the Government's decision to definitize LOGCAP III and the Task Orders, let alone to pay pre-definitization invoices. Cost or pricing data are "all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred." 48 C.F.R. § 2.101. Relator has not explained how the Government's knowledge of the charter flight service bids alone would allow the Government to assess the soundness of estimates of future costs, validate the determinations of costs, or affect its ability to negotiate with Defendants under LOGCAP III.

Relator wrote: "While the cost of the charter service alone was more expensive under the Frankfurt Plan than under the Dubai Plan, that difference was far smaller than the savings that KBR would have realized under the Frankfurt Plan by eliminating most Dubai layover costs and enabling less expensive connecting flights." (Doc. 1 at ¶54). Obviously, one is not required to produce evidence at this stage of the proceedings to back up his allegations. Thus, the Court is not asking Relator to prove his allegation at this point of the litigation. However, one is obligated to describe with specificity the nature of the misrepresentation when one is alleging fraud. *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1105-06 (7th Cir. 2014). An adequately pled complaint of fraud, deceit or false claims should leave the Court with a clear understanding of how such fraud, deceit or false claims were accomplished. Here,

the Relator has not provided in the Complaint how the $75 million figure was created and how that figure stands in relation to the higher cost of charter flight service under the Frankfort Plan, the costs of Dubai layovers, or the cost of anticipated layovers under the Frankfort Plan. The Court finds that there is not enough information in the Complaint as it is currently drafted to understand how and why the Government would find the bid analysis and the unspecified bid materials to be useful in its decisions to pay vouchers submitted for payment.

Importantly, the flight service bids themselves show that the Frankfort Plan was on the surface more expensive than the Dubai Plan. There is no explanation of how these bids would have provided the Government with a basis to conclude Defendants would be able to save $75 million annually by adopting the Frankfort Plan. There must have been some data calculations that allowed the generator of the bid analysis to expect savings. However, there are no specific allegations within the Complaint detailing what that data is and how such data would have allowed the Government to verify the $75 million expectation. This is not an instance of simply failing to meet Rule 9(b) standards because failing to plead fraud with particularity bears on the plausibility of the claim itself. *Grenadyor*, 772 F.3d at 1106 ("The requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible.") And if a claim is not plausible on its face then it cannot withstand a Rule 12(b)(6) motion to dismiss. *E.g.*, *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014).

Third, this Court does not find the *Aerojet* cases to be helpful in analyzing what constitutes cost and pricing data in this case. There, the bids at issue were

competitive bids for the price of nitroethane, a key raw material input for the production of nitroplasticizer. *In Re Aerojet Solid Propulsion Co., ASBCA No. 44568, 00-1 BCA (CCH) ¶30,855*. Aerojet had a contract with the Government for the production of nitroplasticizer. *Id*. Aerojet had an original quote of $1.98 per pound of nitroethane from a supplier. *Id*. Prior to negotiating the price of its contract with the Government, Aerojet solicited and received two additional bids for nitroethane. *Id*. Those bids turned out to be substantially lower than the $1.98 per pound price originally quoted to Aerojet. *Id*. Due to procedures designed to prevent fraud and some fortuitous events, Aerojet did not view the two solicited bids until after the price for the nitroplasticizer contract with the Government was agreed upon, i.e. definitized. *Id*. However, Aerojet never disclosed to the Government that the two unopened bids existed until after the nitroplasticizer contract was definitized. *Id*. The Board (this case did not originate in a district court) found that the existence of unopened bids for nitroethane in Aerojet's possession was "cost or pricing data" that a prudent buyer or seller would reasonably expect to affect negotiations significantly. *Id*. It reasoned that 1) nitroethane was the most expensive raw material used to produce nitroplasticizer; 2) Aerojet solicited the quotations after the parties began negotiations, and the bid opening date was one day after the agreement on price; 3) Aerojet could have easily determined the number of bids and the identity of the bidders prior to the agreement on price; and 4) Aerojet was aware that the price of nitroethane was subject to wide fluctuations during this time period and that it might obtain a price reduction for rail deliveries. *In Re Aerojet*, ASBCA No. 44568, 00-1 BCA (CCH) ¶30,855.

*Aerojet* should not be applied to this case. First and foremost, the bids here are of charter flight services that are understandably fixed throughout the contract term, not a quote on a price-fluctuating raw material. Second, the *Aerojet* decision and the subsequent appellate opinion, do not actually explain how knowledge of the existence of bids impacts an analysis of cost estimates. "Cost or pricing data are . . . all the facts that can be reasonably expected to contribute to the <u>soundness of estimates of future costs and to the validity of determinations of costs</u> already incurred." 48 C.F.R. § 2.101 (emphasis added). The *Aerojet* tribunal found that the contractor was not required to open and disclose to the Government the actual bid prices, yet it nevertheless found that Aerojet was required to disclose the bids existed. This makes little sense because the Government would not be able to assess the soundness of the estimates of future costs or the validity of determinations of costs under the nitroplasticizer contract without either knowing what the actual bid prices of the nitroethane were or at least knowing that the bids were lower than the original $1.98 unit price.

The Federal Circuit Court of Appeals held on appeal that a reasonable buyer or seller would recognize that knowledge of the undisclosed sealed nitroethane bids might give one negotiator an advantage during contract price negotiations because chemical prices fluctuated wildly. *Aerojet Solid Propulsion Co. v. White*, 291 F.3d 1328, 1331 (2002). That court explained that a "primary objective of TINA is to place government and private contractors in roughly equal positions during contract negotiations," *id.* at 1330, and that objective had been undermined by Aerojet's withholding from the Government that the sealed bids existed. Unfortunately, that

court did not explain how the existence of the unopened bids put the two parties in a different bargaining position. As the dissent in that case explained, there was no plausible reason for the Government to have been disadvantaged in its negotiations with Aerojet when neither negotiating party knew the actual values of the sealed bids for the nitroethane. *Id.* at 1333 (J. Bryson dissenting).

In this Court's view, the *Aerojet* court overwhelmingly relied on the Government's assertion that it would have relied upon the lower bids in negotiating a price for its nitroplasticizer contract despite that there was no basis for the Government to know the unsealed bids were actually lower. *White*, 291 F.3d at 1331 ("The Board clearly credited the government negotiators' testimony that they would have used lower cost data to negotiate a lower contract price. Hence, the mere knowledge of the existence of the sealed bids and the June 21 bid opening date may have supplied Aerojet with an advantage in the negotiation process. Any prudent buyer or seller would recognize the existence of the bids as significant to price negotiations."). Clearly then, the tribunal and court in those cases were willing to define "cost and pricing data" through the use of post hoc outcome-determinative reasoning. And in relation to FCA claims, *Aerojet* can be taken to merely underscore what has already been well established in FCA jurisprudence—the fraud must be material to the Government's decision to pay the fraudster. Thus, in the TINA context, information will be deemed "cost and pricing data" if such information is deemed to be material to the Government's definitization decisional process.[4]

---

[4] However, as was mentioned before and will be discussed again in the next section, information can be relevant to the Government's decision to definitize a contract, yet not be relevant to the Government's decision to pay invoices.

In *Aerojet*, the Government initiated the action to pursue Aerojet for defective pricing, and took the position it would have used the information of the lower bids prices to negotiate a lower contract price. These facts influenced the courts' decisions to find the information there to be cost and pricing data because it was clear the Government thought it was deprived of information material to its definitization decisional process. Here, however, there are no specific allegations in the Complaint that speak to how the Government's ability to negotiate the LOGCAP III and its Task Orders with Defendants was affected. For example, the Complaint does not contain allegations that the Government would not have definitized the LOGCAP III or the Task Orders had it known of the bid analysis and the underlying bids.[5] Moreover, here the Government has declined to intervene in this FCA action and thus has failed to make any assertion that its position was compromised in the underlying contract negotiations such that one can reasonably infer the Government would have expected its price negotiations with Defendants over LOGCAP III to be affected significantly.

In short, the Court rejects the premise that the bid analysis or underlying third party bids by themselves constituted "cost and pricing data" in this case. To the extent that the *Aerojet* decisions differ from this Court's conclusion, the decisions of other circuits should be given due consideration but should not be

---

[5] The Complaint does make general allegations that the Government would not have paid the invoices and vouchers Defendants submitted had it known Defendants' TINA certifications were false. (Doc. 1 at ¶29). There are no allegations in the Complaint concerning how the Government would have utilized knowledge of Skylink Arabia's and Ecolog AG's bids in its negotiations with Defendants. Incidentally, as will be discussed more fully in next section of the Opinion and Order, the Complaint also does not provide a basis to identify the amount any given invoice or voucher was falsely inflated.

deemed controlling necessarily upon a district court. *Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir. 1986); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987) ("neither this court nor the district courts of this circuit give the decisions of other courts of appeals automatic deference; we recognize that, within reason, the parties to cases before us are entitled to our independent judgment."). Relator has offered insufficient explanation as to how Skylink Arabia's and Ecolog AG's bids had the potential to influence the Government's decision to definitize LOGCAP III with the Defendants.

There are additional failures in the Complaint that render Relator's claims implausible. In paragraph 28 of the Complaint, Relator alleges "TINA requires that Defendants submit 'cost and pricing data' to the Government <u>prior to the definitization</u> of each LOGCAP III task order" (emphasis added). In paragraph 29, Relator alleges TINA also requires that Defendants "certify that ... the cost or pricing data submitted are accurate, complete and current <u>as of the date of definitization</u>. . . . A truthful certification is a condition of payment under the LOGCAP III contract and Task Orders 59, 89, and 139. If the Government had known Defendants' TINA certifications were false, it would not have paid the invoices and vouchers that Defendants submitted under those Task Orders." (internal quotation marks omitted) (emphasis added). In paragraph 26, the Relator alleges that Task Order 59 was definitized in <u>March 2005</u>. Accepting what the Relator alleges as true, there seems to be no basis for liability for any invoice or voucher submitted in conjunction with Task Order 59 because it was definitized in March 2005, which is more than one year prior to the solicitation of bids or the date

of the bid analysis. (*See* Doc. 1 at ¶¶ 50 and 55). The Defendants could not possibly provide to the Government information that did not yet exist. While Relator alleges that the dates of definitization of Task Orders 89 and 139 have already occurred and implies that such dates occurred after the definitization of Task Order 59, he does not provide the specific dates of their definitization, as he did for Task Order 59 (inasmuch as March 2005 is specific). This is problematic because Relator's theory of liability hinges on the dates of definitization. If Task Order 89 were definitized before June 2006,[6] then invoices submitted in conjunction with it cannot be deemed false or fraudulent either. Even if the bid analysis and the unidentified bid materials did constitute "cost and pricing data", it is entirely possible under the current Complaint that Defendants could have submitted accurate and complete cost and pricing data relating to Task Order 89 as of June 2006.

Another similar problem with the Complaint is that the TINA theory is premised upon the certifications of TINA compliance constituting the false statements but the Complaint fails to allege when exactly such certifications occurred. The Defendants are correct that Relator was required to identify the dates on which the "Certificates of Current Cost or Pricing Data" underlying his claims were executed, because pursuant to his own allegations, only TINA certificates executed after June 2006, when the bid analysis was allegedly created, could even potentially be false. (Doc.1 at ¶59). Moreover, it is nowhere alleged that TINA certificates must accompany the invoices in order for the invoices to be paid.

---

[6] Relator alleges Task Order 139 was not created until August 2006.

Similarly, Relator alleges that the 2006 bids were for charter flight services to commence in 2007, after the expiry of the prior subcontract. (Doc. 1 at ¶50). Relator alleges the false claims began in June 2006, at which point Defendants began making certifications that were false because they withheld the bid analysis and concomitant materials. Accepting that as true, if the subcontract for the Frankfort Plan flight services was not to begin until 2007, then the invoices/bills predicated upon the then existing prior subcontract submitted for the duration of 2006 could not be deemed false since they would not include a falsely inflated premium due to Defendants' failure to choose the Frankfort Plan over the Dubai Plan (which could not begin until 2007).

Thus, even if the Court accepted Relator's theory of liability, the Complaint does not satisfy Rule 9(b)'s requirement of particularized allegations of fraud.

## II. Relator's Second Theory That Defendants Requested And Received Payment For Unallowable Claims In Violation Of The FCA Must Also Fail And He Again Has Not Pled Specific Factual Allegations To Proceed With His Claim.

The second theory of liability offered by Relator is that Defendants violated the FCA by submitting invoices in order to receive payment for costs incurred under the LOGCAP III that were not, in fact, allowable under the applicable regulations. (Doc. 1 at ¶¶7 and 40). Under FAR, allowable costs are defined as those costs that are "reasonable" and satisfy other criteria not relevant for this discussion. 48 C.F.R. § 31.201-2. Costs are "reasonable" if they do not exceed an amount that a prudent person in the conduct of competitive business would pay. 48 C.F.R. § 31.201-3. Relator contends that each and every invoice submitted by Defendants for reimbursement for expenditures related to repatriation and rotational leave under

the Dubai Plan after June 2006 was false or fraudulent because the Defendants knew the costs were actually unreasonable in that they could have saved $75 million dollars by implementing the Frankfort Plan and no reasonable person would forego $75 million dollars in savings.

Relator cites to 48 C.F.R. § 52.232-25, which is included in the LOGCAP III Prime Contract and specifically, Task Order 59,[7] as the authority <u>requiring</u> Defendants to submit invoices to the Government for payment under LOGCAP III. (Docs. 1-2 at 7, 1-3 at 7). That regulation provides that invoices submitted to the Government must satisfy certain criteria. However, none of the criteria mentioned in that particular regulation is an affirmative statement that the cost is allowable or reasonable. *See* 48 C.F.R. § 52.232-25(a)(3)(i)-(a)(3)(x). Relator points to 48 C.F.R. §§ 52.216-7 and 52.216-26 for support that a statement of certification is required, but those regulations clearly state in relevant part that the "Contractor <u>may</u> submit. . . , an invoice or voucher supported by a <u>statement of the claimed allowable cost</u> incurred by the Contractor in the performance of this contract" (emphasis added). The existence of the term "may" expresses that either the submission of the invoice itself or the statement of the claimed allowable cost is optional. Since 48 C.F.R. § 52.232-25(a)(3) states that the Contractor shall prepare and submit <u>the invoice</u> and this regulation is incorporated by reference in the LOGCAP III contract and Task Order 59, the invoice itself cannot be deemed to be optional, so the phrase "statement of the claimed allowable cost" is left as the only plausible object of the

---

[7] These documents were attached to the Complaint as exhibits and thus may be considered by the Court on this Rule 12(b)(6) motion. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

term "may". Since the regulations provide that giving the "statement of claimed allowable cost" is optional, this Court cannot conclude that giving such statement was required. Thus, the Court rejects Relator's contention that statements of certification were required by the regulations.

In *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *12-13 (C.D. Ill. Oct. 25, 2013), this Court explained that no certifications of compliance <u>seemed</u> necessary to plead the FCA claims at issue there and in *dicta*, observed that the Court would be receptive to a claim that an invoice itself could be the false record or statement that influences the Government's decision to pay. Ultimately however, this Court decided that issue need not be resolved because the relator there had adequately alleged that the filing of a standard invoice form carried with it an <u>express certification of compliance</u>, and that disposition of a Rule 12(b)(6) motion to dismiss was not the proper stage at which to contest the veracity of a plaintiff's allegations. *Id.* at *13. Thus, in *Chilcott* the allegations were sufficient to convey to the Court that the plaintiff was pleading an affirmative statement/express certification was required by the defendant to obtain payment in that case. This is not the case here.

Relator takes the reader of the Complaint down an attenuated path, attempting to link separate regulatory provisions to arrive at an alleged requirement that Defendants had to affirmatively state that their costs were allowable in order to receive payment. In paragraph thirty-five, Relator alleges the regulations instruct that allowable costs are costs that are "reasonable". In paragraphs thirty-seven and thirty-eight, he alleges the LOGCAP III, Task Orders

59, 89, and 139 all incorporate[8] the regulations requiring an invoice <u>and</u> a "statement of allowable cost." Here is where the link unravels for as we have seen, the FAR regulations do not require the claimant to provide a "statement of allowable cost" along with an invoice, they merely permit it. (*See supra* p. 31.) Finally, in paragraph thirty-nine, Relator alleges that the FAR regulations require the preparation and submissions of invoices. Thus, Relator is trying to establish that "statements of allowable cost" were required based on regulations mandating invoices. That will not do because the Complaint makes clear the following points: First, only invoices are required under the regulations. Second, the affirmative statement that Relator refers to is not required to get the invoice paid. In other words, Relator's conclusion that "[e]ach voucher or invoice. . . was. . . an affirmative statement that such costs were 'allowable' and 'reasonable'," (*see* Doc. 1 at ¶61) cannot stand in light of the information pled in the Complaint.

Undoubtedly, Relator takes the position that whether or not the "statement of allowable cost" was required is irrelevant. What is relevant from the Relator's point of view is that Defendants submitted the "statements of allowable costs" along with the invoices in order to get the invoices paid with full knowledge that the statements of claimed allowable costs were false because Defendants knew the costs were not reasonable. This argument fails because it is apparent from the Complaint

---

[8] Interestingly, Relator makes his allegations as to what Task Orders 89 and 139 contain on information and belief, yet he has provided no basis for how he has come to be so informed or acquired such belief. In *Grenadyor*, 772 F.3d at 1108, the court explained in a fraud case, allegations based on information and belief will not suffice unless accompanied by an assertion that the facts constituting the fraud are not accessible to the plaintiff and an explanation for the basis for plaintiff's suspicions.

and the quoted regulations that appear throughout the Complaint, that the "statements of allowable cost" were simply not material to the Government's decision to pay the invoices. The Court reaches that conclusion for two reasons. First, again—the statement of allowable costs was permissible and not required. (*See supra* p.31). It can hardly be argued with a straight face that the Government deemed something it did not even require to be submitted to be influential in its decision-making process. Second, nowhere in 48 C.F.R. § 52.232-25(a)(3)—the regulation cited by Relator as the source of the duty of a claimant to prepare and submit invoices and also lists what an invoice must contain to be paid—appears a requirement for a claimant to provide an affirmative statement that the cost is allowable or reasonable.

Relator attempts to salvage the claim by arguing that the FCA does not require in its text any certification requirement. This argument is also unavailing. Relator cannot deny that the FCA requires a plausible allegation that the defendant made a statement to receive payment under 31 U.S.C. § 3729(a)(1)(B). *Gross*, 415 F.3d at 604 (listing requirements to satisfy 31 U.S.C. § 3729(a)(2), now codified as 31 U.S.C. § 3729(a)(1)(B)). Section 3729(a)(1)(B) provides liability for using "a false record or statement material to a false or fraudulent claim." The term "record or statement" should not be interpreted to encompass the term "claim", because reading the statute in that manner violates the well-established canon that different words within the same statute should be given different meanings, *see*, *e.g.*, *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001), and it ignores the distinct meaning of the term "claim" found at § 3729(b)(2)(A). In short, the Court

rejects Relator's argument that the invoices themselves qualify as the "statements" described in §3729(a)(1)(B).

Nor can the Relator deny that under binding Seventh Circuit precedent applying 31 U.S.C. § 3729(a)(1)(A), his particular theory of liability <u>does</u> require the pleading of a certification. Generally, to plead a viable claim under § 3729(a)(1)(A), a plaintiff must plead "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741 (7th Cir. 2007) *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009). Section 3729(a)(1)(A) legal claims do not require the allegation of a statement, but they do require allegation of a false or fraudulent claim. The "claim" is an invoice, i.e. the request for payment. 31 U.S.C. § 3729(b)(2)(A). There is no dispute the Relator is not alleging that the claims are factually false.

In *United States ex. rel. Lusby v. Rolls-Royce Corporation*, the Seventh Circuit allowed a legal claim—similar in nature to Relator's legal claim here in that both claims were alleged to be of the legally false variety—to survive a motion to dismiss because the complaint alleged that the defendant <u>certified</u> that certain parts were of a contractually-specified quality and each and every request for payment under the contract had to be submitted with that certification. 570 F.3d 849, 853-54 (7th Cir. 2009) ("If Rolls–Royce submitted such a certificate, knowing the representations to be false, then it committed fraud."). The teaching of *Lusby* is that if a plaintiff is pleading a legally false claim theory—one in which the claimant

is alleged to have knowingly falsely certified that it has complied with a statute or regulation the compliance with which is a condition for Government payment, *Wilkins*, 659 F.3d at 305—then one must concurrently plead the defendant was obligated to certify or affirmatively state compliance with an applicable rule or regulation. The Court finds that the Relator, despite being sensible enough to include the conclusory allegation that Defendants were obligated to affirmatively state compliance with the applicable regulations, has nevertheless actually failed to point out any such requirement in the Complaint and applicable regulations he contends apply.

Defendants also contend that even if their submission of invoices could be interpreted as affirmative statements that the underlying costs were reasonable, these statements do not constitute objective falsehoods capable of being adjudged true or false, and only empirically verifiable statements can give rise to FCA liability. The Court will address the argument for the sake of completeness even though it has found submission of invoices did not constitute affirmative statements of compliance. Defendants cite *Yannacopoulos*, 652 F.3d at 836, for the proposition that a statement may be deemed false under the False Claims Act only if the statement represents an objective falsehood. The court did not hold so broadly. Importantly, *Yannacopoulos* did not hold that the purported falsehoods there were incapable of being objectively assessed nor did the case give guidance on what sort of purported falsehood is incapable of objective assessment. Ultimately, the Court found that the relator had failed to present any evidence of falsity. *Id*. at 837. Because *Yannacopoulos* was in summary judgment proceedings, the court could

properly assess the evidentiary support of falsity. Here, the case is on a motion to dismiss and no evidence, save what the Relator has attached to the Complaint, can even be considered. Curiously, Defendants concede that the relevant question of whether a cost is reasonable is a highly contestable and fact-specific issue with enumerated criteria that should be taken into account to determine reasonableness. 48 C.F.R. § 31.201-3(b). The fact that the regulation contemplates that the reasonableness of costs can be determined is sufficient enough indication that such costs can indeed be objectively assessed. In any event, in this Court's view, it is the very nature of the "highly contestable and fact-specific inquiry" that makes it inappropriate for resolution on a 12(b)(6) motion to dismiss. Consequently, Defendants' contention that the reasonableness of the costs submitted to the Government for payment is incapable of objective assessment is unavailing.

Finally, even if this Court is incorrect in dismissing the Relator's theory of liability on 12(b)(6) grounds, the Complaint does not satisfy Rule 9(b) of the Federal Rules of Civil Procedure, which requires a relator to plead with "particularity the circumstances constituting fraud." *Grenadyor*, 772 F.3d at 1105-06. At a minimum, the "complaint must state the identity of the person making the misrepresentation, the time, place, and <u>content of the misrepresentation</u>, and the method by which the misrepresentation was communicated to the plaintiff. *Id.* at 1106 (internal quotation marks and citations omitted) (emphasis added). A relator must plead particularized information of fraud or falsity. *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) overruled on other grounds by *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

*Fowler* instructs and *Grenadyor* supports that a relator must allege facts on an individualized transactional level to demonstrate liability. 496 F.3d at 740; 772 F.3d at 1107. In *Grenadyor*, the court wrote:

> [I]t is not enough to allege. . . that the pharmacy engaged in a practice that violated a federal regulation. [Relator] would have had to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of <u>a specific patient</u> who had received a kickback, or at least <u>name a Medicare patient</u> who had received a kickback (presumably if the pharmacy provided a drug to a Medicare patient it billed Medicare for the cost of the drug minus the copay); 496 F.3d at 740-41. The complaint contains no such allegations. Similarly, by <u>failing to identify a single patient</u> who received multiple gift bags over the course of the year the complaint fails to allege with the requisite particularity that any customer received more than $50 worth of these goodies.

772 F.3d at 1107 (internal citations omitted) (emphasis added).

While the specific factual details at issue in *Grenadyor* do not apply here, the legal principle utilized in that case does. When pleading fraud, one must allege facts describing the content of the misrepresentation, amongst other things. Relator alleges that the Government would not have paid the invoices and vouchers that Defendants submitted under those Task Orders. Yet, even had the Defendants implemented the Dubai Plan there would still be costs generated and there is no allegation in the Complaint that the Defendants billed the Government for anything beyond the actual costs they incurred in carrying out the Task Orders. This means that under the Relator's theory some amount of any given invoice had to be legitimate while some amount was theoretically disallowable. Here, Relator has not adequately described the content of the misrepresentation because he has not provided information that can be used to discern how much, if any, of any individual invoice or voucher submitted to the Government under LOGCAP III was artificially

inflated due to Defendants' failure to implement the Frankfort Plan. In short, his claim based on Defendants obtaining payment for disallowable costs must be dismissed.

Moreover, as was detailed in the earlier section, Relator's allegations taken as true indicate that the Frankfort Plan subcontract would not have begun until 2007, yet he contends each and every invoice from June 2006 was in fact disallowable. If the Frankfort Plan subcontract would not begin until 2007, then the 2006 invoices, generated pursuant to the subcontract then in effect, cannot be deemed artificially inflated and therefore cannot be deemed false or fraudulent even under Relator's theory. Yet Relator nonetheless contends every invoice after June 2006 is false or fraudulent. His claim based on Defendants obtaining payment for disallowable costs must be dismissed.

III. **The Relator Has Not Pled Any Facts That State Plausible Claims Under The False Claims Act Based Upon Any Purported Conspiracy or Reverse False Claims.**

Relator listed subparagraphs (C) and (G) of 31 U.S.C. 3729(a)(1) as two of the provisions he was relying upon for his FCA claims by including them in the heading for Count I. [9] (Doc. 1 at 19). Subparagraph (C) of 31 U.S.C. 3729(a)(1) discusses conspiracies to defraud while subparagraph (G) deals with so-called reverse false claims where there is an obligation due to the Government. Relator has not actually pled any facts concerning a conspiracy or any payments due to the Government. The Court does not know whether listing subparagraphs (C) and (G) and inserting the

_____

[9] Relator also included a fleeting reference to "co-conspirators" in paragraph 1 of the Complaint. (Doc. 1 at 2).

term "co-conspirators" was an oversight or clerical error, but on the chance that it was not, the Court must find any claims concerning a conspiracy or reverse false claims contained in the Complaint are woefully inadequately pled. "A bare allegation of conspiracy [is] not enough to survive a motion to dismiss for failure to state a claim." *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009). There must be pled enough facts (taken as true) to suggest the existence of an agreement. *Twombly*, 550 U.S. at 556 and *Iqbal*, 556 U.S. at 680. The Court notes that Relator has not even addressed the issue in his response brief. These claims are therefore dismissed pursuant to Rule 12(b)(6).

## CONCLUSION

For the reasons stated above, the Complaint is dismissed for failure to state claims for which relief can be granted as well as failing to comply with Federal Rule of Civil Procedure 9(b). A review of the docket shows that Relator has not previously amended his complaint. Therefore, the Court finds it appropriate to grant Relator leave to amend his complaint to address the deficiencies and problems described in this Order and Opinion. Relator may amend his complaint within twenty-eight days (28) of the date of this Order. Defendant may then file a responsive pleading or an appropriate motion within twenty-one (21) days thereafter.[10] Should Relator fail to

---

[10] Defendants cursorily argued that KBR, Inc. should be dismissed from this action because the Complaint failed to make any particularized allegations as to KBR, Inc.'s participation in the alleged fraud. Relator failed to respond to the allegation. The Complaint alleges that KBR employees met, discussed the bid analysis, and decided to forego the Frankfort Plan (Doc. 1 at ¶¶ 55-56) and alleges KBR submitted the certificates of current cost or pricing data (Doc. 1 at ¶59). At times the Complaint alleges KBR submitted invoices while at other times it states "Defendants" submitted invoices. The Court finds the allegations very confusing but

amend his complaint within the time allotted, the Court will dismiss this action with prejudice.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss (Doc. 37) is GRANTED.

Entered this 22nd day of May, 2015.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge

---

given the disposition of the motion as to the substance of the claims, the Court finds the issue to be moot and will not comment further on it.